IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 1, 2022

### IN RE BONNIE E.

**Appeal from the Juvenile Court for McMinn County**
**No. 2021-JV-101          R. Wylie Richardson, Judge**

_____

### No. E2021-00919-COA-R3-PT

_____

In this case involving termination of the mother's parental rights to her child, the McMinn County Juvenile Court ("trial court") determined that several statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest. The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Leah B. Sauceman, Athens, Tennessee, for the appellant, Cerithea E.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### I. Factual and Procedural Background

On February 12, 2021, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Cerithea E. ("Mother") to Bonnie E. ("the Child") in the trial court.[1] Previously, the trial court had entered a preliminary order on July 28, 2020, in which it found that probable cause had been established to demonstrate that the Child was dependent and neglected, and an adjudicatory order on August 18, 2020, in which it found by clear and convincing evidence that the Child was dependent and

---

[1] The father of the Child is unknown and is not a party to this appeal.

neglected based upon its factual findings that Mother had used illegal drugs while pregnant with the Child. Consequently, the trial court also determined in its August 18, 2020 order that the Child was a victim of severe child abuse and that Mother was the perpetrator of that abuse.

In its termination petition, DCS alleged that the Child had been exposed to marijuana and amphetamines *in utero* and placed in foster care five days following her birth in February 2020. According to DCS, Mother admitted to "Department representatives" that she had used marijuana and methamphetamine throughout the pregnancy and acknowledged that she did not have appropriate housing for the Child. DCS asserted that it had attempted to help Mother address her issues with illegal drug use and inappropriate housing but that Mother had declined to cooperate with the agency's assistance. In addition, DCS alleged that Mother had failed to participate in "child and family team meetings" and that she had not visited the Child since May 27, 2020. DCS asserted three grounds for termination: (1) abandonment by failure to visit the Child for a period of four consecutive months immediately preceding the filing of the termination petition, (2) severe child abuse, and (3) persistence of the conditions that led to the removal of the Child.

After conducting a bench trial on May 28, 2021, the trial court entered an order on August 5, 2021, finding that DCS had proven by clear and convincing evidence the grounds of abandonment by failure to visit the Child for a period of four consecutive months immediately preceding the filing of the termination petition, severe child abuse, and persistence of the conditions that led to the Child's removal. The court also evaluated the best interest factors, pursuant to Tennessee Code Annotated § 36-1-113(i), finding by clear and convincing evidence that termination of Mother's parental rights to the Child was in the Child's best interest. Accordingly, the court terminated Mother's parental rights to the Child. Mother timely appealed.

## II. Issues Presented

Mother raises the following issues for this Court's review, which we have restated slightly as follows:

1.  Whether the trial court erred by finding by clear and convincing evidence that Mother had abandoned the Child by willfully failing to visit her within the statutorily relevant four-month period.

2.  Whether the trial court erred by finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

- 2 -

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d a.t 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or

substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (2021) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

- 4 -

In its final order, the trial court concluded that clear and convincing evidence supported a finding of three statutory grounds to terminate Mother's parental rights: (1) abandonment by failure to visit, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and -102(1)(A); (2) severe child abuse, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(4) and 37-1-102(b)(27); and (3) persistence of the conditions that led to removal of the Child, pursuant to Tennessee Code Annotated § 36-1-113(g)(3). Although Mother contests only the trial court's finding as to the statutory ground of abandonment by failure to visit, we will address each statutory ground in turn. *See In re Carrington H.*, 483 S.W.3d at 525-26 (holding that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal").

## A. Abandonment by Failure to Visit

Mother contends that the trial court erred by finding that DCS had proven the ground of abandonment by failure to visit the Child, claiming that any failure on her part to visit the Child was not willful. In its final order, the court found that Mother had not visited the Child during the four months immediately preceding DCS's filing of the termination petition. The court also found that DCS had made visitation available to Mother, thereby implicitly finding that her failure to visit the Child was willful. After thoroughly reviewing the record, we conclude that DCS presented clear and convincing evidence to prove that Mother had willfully failed to visit the Child during the determinative period.[2]

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (2021) provides, as relevant to this action:

> (g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing

---

[2] In its appellate brief, DCS notes that Mother may have waived the affirmative defense of a lack of willfulness by failing to raise the defense prior to trial. Although we note that Mother never filed an answer to the termination petition and did not raise the affirmative defense until the day of trial, we conclude that the affirmative defense was not waived but rather tried by implied consent. *See In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020); *see also* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Considering the trial testimony concerning DCS's Covid-19 policies and Mother's lack of reliable cellular telephone reception, the focus placed on willfulness in Mother's closing argument, and the trial court's oral findings as to Mother's willfulness, we conclude that the affirmative defense was tried by implied consent.

conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1) (2021) provides in relevant part:

(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child; . . .

We first note that the trial court correctly determined that the statutorily relevant time period began on October 11, 2020, and ended on February 11, 2021 ("Determinative Period"). *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). The evidence presented at trial also supports the court's finding that Mother did not visit the Child during the Determinative Period.

During trial, Mother testified that she had visited the Child four or five times in person during the entire time the Child was in DCS custody. According to Gail Simpson, the DCS family social worker assigned to the case, Mother visited with the Child in person once at a McDonald's in May 2020 and on another occasion at Mother's residence in August 2020. In addition, Ms. Simpson testified that Mother visited with the Child during a few of the Child's doctor's appointments. B.T. ("Foster Mother") added that Mother had visited the Child twice in March 2020—once during the Child's doctor's appointment and once after a court hearing. In addition, Foster Mother testified that Mother visited with the Child at a Big Lots parking lot although she could not recall the date of the visit.

Both Foster Mother and Ms. Simpson testified that Mother sometimes ended these visits prematurely. Ms. Simpson related that Mother ended the visit at McDonald's after only thirty minutes because she did not wish to keep her ride waiting. Additionally, Ms. Simpson and Foster Mother both explained that Mother ended the visit at her residence prematurely.

With respect to video and telephone calls, Mother testified that she had engaged in two or three video or telephone calls with the Child during the entire time the Child was in

DCS custody. According to Mother, her last in-person visit with the Child was in August or September of 2020, and her last "video visit" occurred on some date prior to Christmas 2020. Ms. Simpson, however, countered this testimony, indicating that DCS had no contact with Mother during the month of December 2020 because Mother had lost her cellular telephone in October. Mother also testified to having sporadic access to a cellular telephone, and on appeal, Mother notes that she had no cellular telephone at one point during this period. Ms. Simpson acknowledged that Mother lacked reliable cellular telephone reception, which inhibited her ability to maintain successful video calls.

Foster Mother testified that Ms. Simpson visited the Child each week and attempted to video call Mother at every visit but that Mother rarely answered. Foster Mother recalled one successful video call between Mother and the Child in March 2020. Ms. Simpson also related that she had attempted to schedule a visit for October 14, 2020, but that Mother did not have a cellular telephone at the time. The evidence presented at trial demonstrates that none of Mother's in-person visits or video calls with the Child took place during the Determinative Period.

Mother does not contest the trial court's finding concerning her lack of visits during the Determinative Period. Instead, she posits that her failure to visit the Child was not willful by reason of (1) DCS's Covid-19 policy of offering visits only via video or telephone calls, (2) Mother's lack of reliable cellular telephone and internet service at her residence, (3) the loss of Mother's cellular telephone during Fall 2020, and (4) doctors' offices' Covid-19 policies allowing only one other person in the room with the Child during appointments. Mother protests that DCS knew of Mother's cellular telephone service problems and the subsequent loss of her cellular telephone but failed to facilitate a solution or alternative manner of visitation.

Tennessee Code Annotated § 36-1-102(1)(I) provides in pertinent part:

[I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence.

As previously explained by this Court, "willfulness" does not require the same standard of culpability as is required by the criminal code, and it does not require "malevolence or ill will." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). Rather "[w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent," and such conduct is the "product of free will rather than coercion." *Id.* Furthermore, a parent's failure to visit is "not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with

- 7 -

the parent's efforts to support or develop a relationship with the child . . . ." *Id.* at 864 (internal citations omitted). Conduct that would amount to a significant restraint or interference with a parent's ability to visit includes "blocking access to the child," "keeping the child's whereabouts unknown," and "vigorously resisting a parent's efforts to visit the child." *Id.* at 864, n.34.

Following our thorough review of the evidence presented at trial, we conclude that DCS's actions in this matter did not constitute a significant restraint of or interference with Mother's efforts to visit the Child. DCS never prohibited or prevented Mother from visiting with the Child. Instead, the evidence demonstrates that DCS attempted to facilitate Mother's visitation either in person, via telephone, or via video conference. Although Mother claims that "video visits were her sole source of visitation," the evidence at trial does not support this claim.

Although Ms. Simpson gave the impression that DCS primarily offered Mother visits via video or telephone calls due to the Covid-19 pandemic, Mother also had opportunities to visit the Child in person. Despite Mother's assertion that Covid-19 policies prevented her from attending doctor's appointments with the Child, Ms. Simpson explained that Mother was permitted to visit the Child before or following appointments and that Mother did, in fact, visit the Child a few times before or after these appointments prior to the Determinative Period. Ms. Simpson stated that on one occasion in June 2020, she even offered to drive Mother to the Child's doctor's appointment, and Mother refused her offer.

According to the proof at trial, in-person visits were not limited to the Child's doctor's appointments. Mother was permitted in-person visits at a McDonald's, at Mother's residence, following a court hearing, and at a Big Lots. Based on Ms. Simpson's and Foster Mother's testimony, Mother was permitted to visit the Child in person during the Covid-19 pandemic.

Instead of placing a significant restraint on Mother's ability to visit the Child, such as "blocking access to the child," "keeping the child's whereabouts unknown," and "vigorously resisting a parent's efforts to visit the child," *see In re Audrey S.*, 182 S.W.3d at 864, n.34, the evidence demonstrates that DCS attempted to facilitate in-person visits during the Child's doctor's appointments and at other locations as well as during video and telephone calls. Ms. Simpson testified that she would provide Mother advance notice of the video calls and that when Mother experienced poor reception, Ms. Simpson would "keep trying to call her back to reconnect." In Ms. Simpson's December 1, 2020 "Declaration of Reasonable Efforts," entered into evidence as an exhibit, she stated: "I have offered video visits but the last one scheduled on September 17, 2020 was not answered after six attempts. I have seen [Mother] since and reminded her that she still can have visits, but she has not asked to set up any video visits since September." In addition,

Ms. Simpson pointed out that she had offered Mother transportation. We determine that far from presenting an obstacle to Mother, DCS attempted to facilitate visits and calls.

Moreover, this Court has previously concluded that the parent bears some level of responsibility for arranging and insisting upon visitation. *See In re S.Y.*, 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003) (concluding that the children's guardian did not bear the "sole burden for maintaining contact with the parent and organizing visitation schedules" but that the parent had "a duty to make every reasonable effort to arrange and insist upon visitation with her children"). Mother proffered no evidence to indicate that she had insisted upon visitation with the Child or attempted to arrange visitation only to be thwarted in her efforts by DCS. Instead, the evidence at trial established that Mother sometimes ended visits prematurely and declined to attend at least one offered visit during the Child's doctor's appointment in June 2020.

Notwithstanding Mother's claims regarding her lack of ability to participate in video or telephone calls, such circumstances cannot and do not excuse the fact that she did not visit the Child at all during the Determinative Period. Tennessee Code Annotated § 36-1-102(1)(E) provides in pertinent part: "That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period." Mother does not explain why she was unable to contact DCS by some other method to arrange in-person visits or that she otherwise made any effort to arrange visitation. The trial court found that Mother had failed to visit the Child during the Determinative Period, and the evidence presented at trial does not preponderate against this finding. Therefore, Mother cannot rely on her lack of a cellular telephone or reliable internet service to excuse her failure to maintain contact or visit with the Child during the Determinative Period.

Following thorough review of the record, we conclude that the trial court properly determined that clear and convincing evidence supported this statutory ground for termination of parental rights. We therefore affirm the trial court's determination that Mother had abandoned the Child by failing to visit her.

### B. Severe Child Abuse

Although Mother contests solely the trial court's finding of abandonment as a ground for termination, we must also review the trial court's findings that clear and convincing evidence supported the statutory grounds of severe child abuse and persistence of the conditions that led to the removal of the Child. With respect to the statutory ground of severe child abuse, Tennessee Code Annotated § 36-1-113(g)(4) (2021) provides:

> (4)     The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or

- 9 -

the petition for adoption to have committed severe child abuse against any child[.]

Tennessee Code Annotated § 37-1-102(b)(27) (2021) defines "severe child abuse" as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]

On August 18, 2020, the trial court conducted a hearing and entered an order finding that Mother had used methamphetamine and marijuana while pregnant, that the Child was therefore a victim of severe child abuse, and that Mother was the perpetrator pursuant to Tennessee Code Annotated § 37-1-102(b)(27). DCS introduced the order as an exhibit at the termination trial. The prior court order served as the court's basis for finding that DCS had presented clear and convincing evidence to prove the ground of severe child abuse. We therefore conclude that the court did not err by relying on its prior order in finding clear and convincing evidence of this statutory ground. *See State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005) ("The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.")

The evidence presented at trial also supports this finding. Mother acknowledged at trial that her "drugs of choice" at the time of the Child's birth were methamphetamine and marijuana. Ms. Simpson reported that the Child tested positive for methamphetamine at birth. According to Ms. Simpson, Mother admitted to her that she had used methamphetamine and marijuana throughout her pregnancy with the Child. As this Court has previously concluded, a mother's drug use during pregnancy may constitute severe child abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(27). *See In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *4 (Tenn. Ct. App. Nov. 26, 2019) ("[T]his Court has repeatedly confirmed that severe child abuse can be based on a mother's prenatal drug use.").

We therefore conclude that the trial court did not err in finding that clear and convincing evidence supported this statutory ground for termination of Mother's parental rights. We affirm the trial court's finding concerning the statutory ground of severe child abuse.

### C. Persistence of Conditions

The trial court also found clear and convincing evidence supporting the ground of persistence of the conditions that led to removal of the Child from Mother's home or

physical or legal custody.  Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2021) provides:

> (A)    The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> >
> > (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B)    The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In its final order, the trial court found that the Child had been in DCS custody for far longer than the statutorily required six months, noting that the Child had been in foster care since February 2020, which was more than one year prior to trial.  The court further determined that the conditions that led to the Child's removal persisted and that returning the Child to Mother's custody would, in all reasonable probability, cause the Child to be subjected to further abuse or neglect.  The court also found that Mother continued to struggle with substance abuse, lacked stable and appropriate housing, and was incarcerated at the time of trial.  As such, the court determined that Mother would be unable to remedy these conditions at an early date to allow her to regain custody of the Child.  Considering that Mother's earliest possible release date would not be until July 2021 and that she planned to enter a twelve- to eighteen-month rehabilitation program upon her release, the court calculated the earliest date that the Child possibly might be returned to Mother to be fourteen months from the time of trial.  The court further found that continuation of the parent-child relationship greatly diminished the Child's chances of early integration into a safe, stable, and permanent home.  The evidence at trial did not preponderate against these findings and determinations.

- 11 -

The Child was removed from Mother's custody in February 2020. DCS filed its termination petition on February 12, 2021, and the trial court conducted the trial on May 28, 2021. Thus, by the time of trial, the Child had not been in Mother's custody for over a year. The Child was removed from Mother's custody due to Mother's unlawful drug use during her pregnancy with the Child. Mother admitted to using methamphetamine and marijuana throughout her pregnancy with the Child and acknowledged that she did not have a suitable home in which to raise the Child. Mother's substance abuse issues and unsuitable housing persisted to the time DCS filed the termination petition.

Mother testified that the last time she had used methamphetamine was on February 15, 2021, the day before her arrest. Ms. Simpson reported that Mother tested positive for methamphetamine while in jail in February 2021. In addition, Ms. Simpson articulated that Mother refused to submit to drug screens throughout the pendency of DCS's custody of the Child.

With respect to Mother's housing situation, Mother conceded that at the time of the Child's birth, her home was inappropriate for the purpose of raising a child. Mother explained that she lived in a "trap house," which she described as "a place where drug addicts are in and out all the time and drugs are being used all the time." According to Mother, she lived in the "trap house" until December 2020, at which point she decided that she would rather be homeless than continue living in the house. Ms. Simpson described Mother's residence as a "shack" that lacked a kitchen, a bathroom, and access to water and electricity. At the time of trial, Mother was incarcerated, facing a charge of aggravated burglary. Based on the testimony referenced above, DCS presented ample evidence to support the trial court's determination by clear and convincing evidence that the conditions leading to the Child's removal from Mother persisted.

We also agree with the trial court's assessment that Mother could not feasibly remedy the conditions that led to the Child's removal at an early date considering that she was still incarcerated at the time of trial and that she planned to enter a twelve- to eighteen-month rehabilitation program following her release from jail. Moreover, given that the Child was removed from Mother's custody five days following birth and had not been in Mother's custody for over a year without any improvement in Mother's conditions, we concur with the trial court that continuation of the parent-child relationship would inhibit the Child's ability to integrate into a safe, stable, and permanent home. We therefore determine that the trial court did not err in concluding that clear and convincing evidence established this statutory ground for termination as well.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge,

- 12 -

and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the termination petition was filed in the instant action listed the following factors for consideration:[3]

(1)   Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)   Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)   Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)   Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[3] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has instructed regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the

child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In considering the best interest factors, the trial court found that six factors weighed in favor of terminating Mother's parental rights to the Child. Concerning the first factor, whether Mother had made an adjustment of circumstance, conduct, or conditions, the trial court considered this factor to weigh heavily in favor of termination. As noted previously, Mother was incarcerated and continued to struggle with substance abuse issues at the time of trial. Even before Mother was incarcerated, she continued to lack appropriate housing as she transitioned from a house replete with drug use to homelessness.

Mother urges that the trial court erred in weighing the first factor in favor of termination, noting that "she was making strides to correct her drug use and planned to enter [a rehabilitation program]." However, Mother's intention to seek rehabilitation for her unlawful drug use does not constitute an adjustment of circumstance, conduct, or conditions. Rather, Mother's stated intention is merely a plan that could take eighteen months to complete. As reviewed previously, the focus of the best interest factors is on the child, rather than the parent. *See In re Audrey S.*, 182 S.W.3d at 878. Mother had in excess of a year to initiate steps to make an adjustment to her living situation and to address her

- 15 -

drug use but failed to do so.  The Child should no longer wait in foster care for another twelve to eighteen months while Mother strives to address her housing and substance abuse issues.  Predicated on the evidence presented at trial, we agree with the trial court's assessment of the first factor.

With respect to the second factor, whether Mother had failed to make a lasting adjustment after reasonable efforts by DCS, the trial court found that this factor also was balanced in favor of termination.  In doing so, the court correctly noted that DCS had no longer been required to make reasonable efforts to assist in the reunification of Mother and the Child after the Child was adjudged a victim of severe child abuse on August 18, 2020. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A).  The trial court found that despite being relieved of its duty to assist Mother, DCS continued to make reasonable efforts to assist her.  Ms. Simpson testified that she had scheduled three different appointments at a health facility named "Health Connect" for Mother to submit to an alcohol and drug assessment.  Mother never appeared for any of these appointments, resulting in Health Connect's subsequent refusal to reschedule appointments for her.  Mother eventually attended an appointment scheduled by Ms. Simpson at the Hiwassee Mental Health facility.  However, DCS never received the results of the respective assessment because Mother never signed the release of information form.  In addition, Ms. Simpson attempted to provide Mother with a letter that would help her obtain more suitable housing.  Despite these efforts, Mother never acquired suitable housing and continued to use drugs.  Thus, the court correctly determined that DCS made reasonable efforts to assist Mother; that Mother made no lasting adjustment to her circumstance, conduct, or condition; and that this factor weighed in favor of termination.

Concerning the third factor, whether Mother had maintained regular visitation with the Child, the trial court weighed such against termination.  In doing so, the court found that Mother put forth some degree of effort to engage in visits with the Child although visits were inconsistent.  The trial court considered the fourth factor, whether there was a meaningful relationship between Mother and the Child, to weigh in favor of termination.  The court noted that Mother had "made some effort to engage in a relationship" with the Child but ultimately that there was no meaningful relationship between the two considering Mother's limited contact with the Child.  Inasmuch as the Child had been removed from Mother's custody five days after birth and did not see Mother consistently thereafter, the court did not err in determining the fourth factor to be in favor of termination.

The trial court considered the fifth factor, the effect a change of caretakers and physical environment would likely have on the child's emotional, psychological and medical condition, to weigh in favor of termination.  The court found that the Child was in a stable home with her foster parents—the only home the Child had known.  Therefore, the court weighed this factor heavily in favor of termination.  The evidence at trial supports the court's assessment.  Mother was incarcerated at the time of trial and continued to struggle with substance abuse issues until the time of her arrest.  In contrast, the Child had

been in the care of the same foster family from the time she was five days old. According to Ms. Simpson, the Child was bonded to the foster family and thriving in their care. Therefore, the court did not err in weighing this factor in favor of termination.

Concerning the sixth factor—whether Mother or other people residing with her had shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the Child, or another child or adult in the family or household—the trial court adjudicated this factor in favor of termination based on Mother's unlawful drug use during her pregnancy with the Child. As we have already affirmed, Mother's drug use constituted severe child abuse. Mother, however, contends that this factor should not weigh in favor of termination inasmuch as the abuse occurred while the Child was *in utero*. However, Mother provides no supporting authority for her proposition that drug exposure to a child *in utero* should not be considered under this factor. Contrary to Mother's postulate, this Court has previously concluded that "drug use in utero weighs in favor of termination under this factor." *In re Jaidon S.*, No. M2021-00802-COA-R3-PT, 2022 WL 1017230, at *11 (Tenn. Ct. App. Apr. 5, 2022). The court therefore did not err in determining this factor to be in favor of termination.

The trial court weighed the seventh factor, which involves the safety of Mother's home, in favor of termination. The evidence at trial supports the court's assessment. Mother admitted that she was either homeless or residing in an environment where "drugs [were] being used all the time" prior to her incarceration. At the time of trial, Mother could not have provided the Child with a suitable home environment. The court did not err in finding this factor in favor of termination.

Finally, the trial court determined the remaining two statutory factors as weighing against termination of Mother's parental rights. DCS did not present evidence related to Mother's mental or emotional status or whether she made child support payments. Ergo, the court correctly determined these factors as against termination.

Considering the evidence, we agree with the trial court's assessment of these last two factors. However, we further agree with the trial court's ultimate determination by clear and convincing evidence that termination of Mother's parental rights to the Child was in the Child's best interest based on the proof presented. By the time of trial, the Child had spent nearly her entire life with the same foster family, and the evidence demonstrated that the Child had bonded with them. Mother acknowledged that she had seen the Child only four or five times since the Child was placed in foster care, a period spanning more than a year. The Child's bond with her foster family, in conjunction with Mother's persistent housing and substance abuse issues and Mother's incarceration at the time of trial, supports the court's conclusion that the termination of Mother's parental rights was in the Child's best interest. We therefore conclude that the evidence preponderates in favor of the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Cerithea E.


s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE